















JPP   11/6/01   8:52

3:01-CV-02024   PLESTINA V. BAETZ

*1*

*CMP.*

THOMAS D. MAURIELLO
State Bar No. 144811
**LAW OFFICES OF THOMAS D. MAURIELLO**
*A Professional Law Corporation*
4040 Civic Center Drive, Suite 200
San Rafael, CA 94903
Telephone: 415/472-4953
Facsimile: 415/472-7713

DARREN J. QUINN, ESQ.
**LAW OFFICES OF DARREN J. QUINN**
State Bar No. 149679
101 West Broadway, Ste. 1950
San Diego, California 92101-3548
Telephone: 619/232-9400
Facsimile: 619/232-9488

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

01 CV 2024 IEG (POR)

| | |
|---|---|
| RICHARD PLESTINA,<br><br>Lead Plaintiff,<br><br>v.<br><br>DOUGLAS R. BAETZ, GLENN M. GALLANT, FINITY HOLDINGS, INC. (fka COLUMBIA CAPITAL CORP.), FINITY CORPORATION (fka FIRST INDEPENDENT COMPUTERS CORP.), CHUCK LaMONTAGNE, KENNETH KLOTZ, and DOES 1 - 100,<br><br>Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>COMPLAINT FOR:<br>1)VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934;<br>2)VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTION 25400 ET SEQ.;<br>3)VIOLATION OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT;<br>4)FRAUD;<br>5)CONSPIRACY;<br>6)NEGLIGENCE;<br>7)NEGLIGENT MISREPRESENTATION;<br>8)VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.;<br>9)CONSPIRACY<br><br>DEMAND FOR JURY TRIAL |

ORIGINAL

**JURISDICTION AND VENUE**

1.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5. Further jurisdiction is conferred pursuant to the Racketeer Influenced Corrupt Organizations Act ("RICO"), under which certain of the claims asserted herein further arise. Jurisdiction as to Plaintiffs' claims based on state law is conferred by supplemental or pendent jurisdiction.

2.     Venue is proper in this District pursuant to §27 of the 1934 Act. Defendants sold or caused to be sold the common stock of Finity Holdings, Inc. (fka Columbia Capital Corp.)(hereinafter, "Finity") to investors residing in this District and issued false and misleading statements to investors residing in this District, including members of the class. In addition, plaintiffs are informed and believe that Finity was licensed to and did business in California.

**THE PARTIES**

3.     Plaintiff Richard Plestina purchased or acquired 97,200 shares of Finity stock during the Class Period, and suffered damages as a result of violations of the federal securities laws alleged herein.

4.     Defendant Finity Holdings, Inc., formerly known as Columbia Capital Corp. (referred to as "Finity" or "Columbia" or "Finity/Columbia"), a Texas corporation with its principal executive offices located in Abilene, Texas, at all times relevant hereto has been in the business of credit and debit card services, banking and financial services, and document management and distribution services.  On or about September 6, 2000, the company then known as Columbia Capital Corp. changed from a Delaware corporation to a Texas corporation named Texas Columbia Capital Corp. On the same date, that entity changed its name once again, to Finity Holdings, Inc. During the Class Period, Columbia's common stock has traded in an efficient market on the Over-The Counter Bulletin Board ("OTCB") maintained by the National Association of Securities Dealers under the symbol "CLCK."

5.     Defendant Finity Corporation, formerly known as First Independent Computers, Inc.,

1  a Texas corporation (hereinafter, "Finity Corp." or "Finity Corp./FIC"), at all times relevant hereto

2  has been in the business of information services and at all times relevant hereto has been a wholly-

3  owned subsidiary of Finity (f/k/a Columbia). Its predecessor company was named First Independent

4  Computers, Inc.  On or about March 1, 2000, First Independent Computers, Inc. changed its name

5  to Finity Corporation.

6      6.    Defendant Douglas R. Baetz ("Baetz") was at all relevant times a director, officer and

7  a principal shareholder of Finity/Columbia. He signed Finity/Columbia's relevant shareholder

8  disclosure documents and SEC reports issued during the Class Period.

9      7.    Defendant Glenn M. Gallant ("Gallant") was at all relevant times Secretary of

10  Finity/Columbia and chairman of the board of directors and a principal shareholder. He signed

11  Finity/Columbia's relevant shareholder disclosure documents and SEC reports issued during the

12  Class Period.

13      8.    Defendant Chuck LaMontagne ("LaMontagne") was at all relevant times Chief

14  Financial Officer and Executive Vice President of Finity/Columbia. He signed Finity/Columbia's

15  relevant shareholder disclosure documents and SEC reports issued during the Class Period.

16      9.    Defendant Kenneth Klotz ("Klotz") was at all relevant times President of

17  Finity/Columbia. He signed Finity/Columbia's relevant shareholder disclosure documents and SEC

18  reports issued during the Class Period. Klotz remains an officer and/or director of Finity/Columbia.

19      10.   The individuals named as defendants in ¶¶6-9 above are referred to herein as the

20  "Individual Defendants." The Individual Defendants, because of their positions as high-ranking

21  officers and/or directors with the Company, possessed the power and authority to control the contents

22  of Finity/Columbia's quarterly and annual reports, SEC filings, press releases and presentations to

23  securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each

24  defendant was provided with copies of the Company's reports, SEC filings and press releases alleged

25  herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

26  prevent their issuance or cause them to be corrected. Because of their positions and access to material

27

CLASS ACTION COMPLAINT                    3

1  non-public information available to them but not to the public, each of these defendants knew that

2  the adverse facts specified herein had not been disclosed to and were being concealed from the public

3  and that the positive representations which were being made were then materially false and

4  misleading. The Individual Defendants are liable for the false statements pleaded herein, as those

5  statements were each "group-published" information, the result of the collective action of the

6  Individual Defendants.

7      11.    Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose

8  adverse facts known to him about Finity/Columbia, *or* (iii) participating in a fraudulent scheme which

9  permitted defendants to continue in their positions of power, prestige and profit. Defendants'

10  fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of

11  Finity/Columbia stock was a success, as it (i) deceived the investing public regarding

12  Finity/Columbia's products and business; (ii) artificially inflated the price of Finity/Columbia's stock;

13  and (iii) caused Plaintiffs and other members of the Class to purchase Finity/Columbia stock and

14  options at inflated prices.

15                    **STATEMENT OF THE CASE**

16      12.    This is a securities class action on behalf of purchasers of the common stock and

17  publicly traded options for common stock of Finity/Columbia from October 28, 1997 through and

18  including November 12, 1999 (the "Class Period"), against Finity/Columbia, its subsidiary Finity

19  Corp./FIC, and certain of Finity/Columbia's officers and directors for violations of the 1934 Act and

20  California law.

21      13.    Pursuant to the principles enunciated in *American Pipe Construction Co. v. Utah, 414*

22  *U.S. 538, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974),* and Crown Cork & Seal Co. v. Parker, 462 U.S.

23  345, 76 L. Ed. 2d 628, 103 S. Ct. 2392 (1983) the statute of limitations has been tolled and continues

24  to be tolled during the pendency of *Grant v. Baetz, et al.,* United States District Court Southern

25  District of California, Case No. 00CV1527-J(BEN) ("Grant Action"). The Grant Action is still

26  pending and no adverse determination regarding class issues has been made in the Grant Action.

27

14.   During the relevant time frame, Finity/Columbia was in the business of credit and debit card services, banking and financial services, and document management and distribution services. In connection with these services, Finity/Columbia provided its customers with a link between consumers, merchants and financial institutions by capturing the initial transaction at the point of sale, giving the merchant credit for that transaction, posting the transaction to the financial institution's accounts receivables and general ledger, and ultimately placing the transaction on the customer's statement.   Finity/Columbia operated through its wholly-owned subsidiary, Finity Corporation (formerly known as "First Independent Computers, Inc.," a Texas corporation), a multi-faceted information service company.

15.   On April 28, 1997, Defendants Gallant and Baetz purchased all the common stock of Finity Corporation for $1,600,000 in cash.   On September 23, 1997, Finity purchased all of the common stock of Finity Corporation from Defendants Gallant and Baetz in exchange for 10,631,250 shares of Finity common stock, which represented approximately 85% of Finity's then issued and outstanding stock.

16.   During the Class Period, Finity/Columbia's executives issued extremely positive statements about Finity/Columbia's business. Defendants told investors that Finity/Columbia enjoyed strong or increasing demand for most of its products and services.   The truth, however, contrasted starkly with defendants' representations.

17.   Plaintiffs are informed and believe that Defendants materially inflated sales and earnings, deceiving the investing public. Defendants thus caused Finity/Columbia's financial results reported during the Class Period to be in gross violation of Generally Accepted Accounting Principles ("GAAP").   Defendants carefully concealed their conduct.

18.   Defendants' public statements were materially false.   The effect of this fraud was to inflate Finity/Columbia's financial results and to cause the market to overvalue Finity/Columbia stock and options during the Class Period.

**DEFENDANTS' SCIENTER**

19.　Defendants' scienter can be shown by their relationship to Bestbank.

20.　BestBank was part of a credit card scheme concocted by, *inter alia*, defendants Baetz and Gallant (Finity/Columbia's former chairman and directors) to market credit cards to persons who would not normally qualify for a credit card. BestBank offered credit cards with a $600 limit. The hitch was prospective cardholders had to pay $498 to join the All Around Travel Club (run by defendants Baetz and Gallant) and a $50 membership fee. That left all of $52 of available credit to most cardholders.

29.　Defendants were aware that most BestBank credit card holders had no capacity to pay the initial $548 balance on a credit card the credit for which was essentially maximized from the start. Defendants Baetz and Gallant, and others with their knowledge and/or assent, arranged for and paid minimum payments to the accounts of these debit card holders to maintain the illusion that the accounts were in good order and that the Company would continue to benefit from processing those accounts. Baetz and Gallant also created and/or caused to be created and maintained fraudulent accounting records to account for the secret payments and hide them from the Company's accountants and the shareholders.

30.　BestBank profited from every card it issued. Plaintiffs are informed and believe that Defendants Baetz and Gallant reaped a quarter of a billion dollars from the $498 travel club memberships sold by their AATC. Defendant Finity/Columbia, controlled by defendants Baetz and Gallant, reaped millions more processing the applications and servicing the BestBank accounts that were worthless, in default and/or fraudulent.

31.　In July, 1998 the Federal Deposit Insurance Corporation ("FDIC") took receivership over BestBank and its 437,000 credit card portfolio. In October 1998, the FDIC filed a lawsuit in Colorado seeking $300 million in damages against BestBank, its management, and defendants Baetz and Gallant, alleging fraud, conspiracy and violation of the federal RICO statute. The complaint alleged a scheme involving Century Financial, whose majority and controlling shareholders were

1  Baetz and Gallant, and AATC.

2       21.    The Individual Defendants had the ability to commit the fraud complained of, and did,

3  as they were the top executives and/or directors of Finity/Columbia.  Each of the Individual

4  Defendants was in a position to, and did, learn the details of Finity/Columbia's business condition,

5  accounts, financial reporting, operating results, prospects, and sales and inventory practices, through

6  numerous management meetings, through conversations with other executive officers and directors,

7  and through the review of regularly prepared reports that were circulated among defendants and others

8  regarding the Finity/Columbia's accounts, sales, orders, inventories, products, and financial

9  performance.  As Finity/Columbia's top executives and/or directors, the Individual Defendants

10  controlled Finity/Columbia's publicly issued financial statements and the disclosures made in them,

11  Finity/Columbia's public statements, and its SEC filings, and thus could falsify them.  They were

12  involved with important issues facing Finity/Columbia's business such as directing and managing

13  sales, and issuing Finity/Columbia's SEC filings, press releases and financial statements.

14       22.    Not only did defendants learn of the adverse factors affecting Finity/Columbia's

15  business, plaintiffs are informed and believe that they directed steps to conceal these facts from the

16  investing public.

17       23.    Each of the Individual Defendants, because of their top executive positions with

18  Finity/Columbia and involvement in the day-to-day management of its business, actually knew from

19  conversations with other corporate officers and employees and their attendance at management and

20  Board meetings, the adverse non-public information about Finity/Columbia's misleading financial

21  statements, its deteriorating revenue and EPS prospects, the lack of demand for its services. Thus,

22  each Individual Defendant actually knew or with deliberate recklessness disregarded that

23  Finity/Columbia's public statements were false and/or misleading when made.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

24

25

     24.    As part of defendants' scheme to lead the investing public to believe that

26  Finity/Columbia's finances, business and prospects for growth were sound, Finity/Columbia issued

27

1  a number of false and misleading statements in, inter alia, reports filed with the SEC, reports to

2  shareholders, and press releases. Many of defendants' false and misleading statements concerned

3  defendants' agreement/relationship with BestBank.

4        25.    Despite Defendants' knowledge that most of the BestBank credit card accounts were

5  worthless, in default and/or fraudulent, Defendants inflated the price of Finity/Columbia stock by

6  announcing that Finity/Columbia would service the BestBank accounts and reap huge revenues. On

7  October 28, 1997, Finity/Columbia issued a press release that provided:

8      Agreement Valued at $ 12 Million Annually in Revenues

9      First Independent Computers Inc., a subsidiary of Columbia Capital Corp. (OTCBB:
10  CLCK), announced today that it has signed a processing contract with BestBank,
    Boulder, Colorado, to process BestBank's credit card portfolios. Kenneth A. Klotz,
11  president of First Independent Computers (FIC), said **the value of the contract to
    FIC is estimated to be approximately $ 12 million annually in processing
12  revenue**. He said that BestBank, a major credit card issuer, turned over to FIC the
    processing of approximately 300,000 VISA accounts previously processed by First
13  Data Corp. **BestBank also anticipates that this portfolio will grow by a minimum
    of 300,000 accounts during the next year due to aggressive marketing programs.**
14  First Independent Computers, headquartered in Abilene, Texas, is involved in credit
    card service support and transaction processing; banking/financial services and data
15  processing; and document management and distribution services.

16        26.    Two days later, the annual revenue projection more than doubled to $25 million in

17  revenues annually to Finity/Columbia. A press release dated On October 30, 1997 stated:

18      Agreement Valued in Excess of $ 25 Million Annually in Revenues

19      First Independent Computers Inc., a subsidiary of **Columbia Capital Corp.**
20  (OTCBB: CLCK) announced today that it has reached an agreement with BestBank,
    Boulder, Colo., to process VISA debit cards for the bank. **The new program is
21  estimated to provide in excess of $ 25 million annually in processing revenues for
    First Independent Computers**. The first program will be marketed by Financial
22  Marketing Systems Inc., through check cashing stores throughout the country. A
    spokesman for Financial Marketing Systems stated that the company expected to be
23  marketing the cards in more than 3,400 stores within a year. The program was
    introduced today at an industry convention in Dallas. **The parties to the agreement
24  believe that the program should generate more than one million new VISA debit
    cardholders within the next year, because most customers who use check cashing
stores cannot obtain a VISA credit card**.

25      First Independent Computers, headquartered in Abilene, Texas, is involved in credit
26      card service support and transaction processing; banking/financial services and data
    processing; and document management and distribution services.

27

(Emphasis added).

27.    Within a very short period of time, this BestBank contract accounted for approximately 92% of the credit card revenues.  The Form 10Q for the period ended March 31, 1998 stated:

> Credit card processing revenues during the three (3) months ended March 31, 1998 increased to $1,964,717 from $490,636 during the three (3) months ended March 31, 1997. This increase primarily relates to the revenues associated with the Master Agreement. **The Master Agreement with Best Bank represented 92% of the credit card revenues for the three (3) months ended March 31, 1998**.

28.    In its Registration Statement on Form 10-SB/A filed with the SEC on or about June 16, 1998, and signed by defendant Klotz, the Company stated:

> The Company concentrates on a niche market consisting of small to medium-sized accounts that have not achieved adequate economies of scale to operate their own in-house programs and systems.  In addition, the Company seeks strategic alliances with appropriate size banks, thrifts, credit unions, insurance companies, merchants, utilities, government agencies and other service companies whose success depends on successful data management.

> * * *

> The industry in which the Company competes is highly fragmented.  The Company believes that with its vast range of services and the Year 2000 compliance issues facing prospective new customers, those banking and financial institutions looking for a new and compliant solution will begin to migrate from their in-house solutions to companies on an out-source basis.

> * * *

> [A]nnual credit and debit card purchases in the United States have reached the $1 trillion mark.  The combination of growth in the number of transactions and the continuing general trend toward outsourcing data processing functions directly benefits the Company. Outsourcing involves having a third party contractor perform a variety of services or tasks, such as those provided by the Company to the issuer of the credit and debit card.  This trend is anticipated by management of the Company to remain a source of increased         business in the future.

> * * *

> With the continued upgrade of equipment and software, management of the Company believes that the Company has the capability to handle its recent and significant growth in the number of credit card processing transactions, as well as the further anticipated increase in volume of credit card processing transactions, which are expected to increase during fiscal year 1998.

CLASS ACTION COMPLAINT                              9

* * *

Steps taken by the Company to insure that it will be able to provide the efficient processing required by the expansion of the credit card services business, include the recent installation of significant additional equipment necessary to the operation of a full-service credit card transaction processing company. The Company entered into a mainframe computer lease with IBM for 36 months, starting in October 1997. The Company further upgraded its mainframe computer CPU again in March 1998 for its anticipated growth in business.

29.     The Company's June 16, 1998 Registration Statement also emphasized that it "provides a full range of card processing services for approximately sixteen customers which consist of nine banks, three retailers and four financial service organizations that do not operate their own in-house programs and systems." The Company further indicated:

The Company has entered into multi-year agreements with most of its customers. For the year ended December 31, 1997, BestBank of Colorado ("BestBank"), an unaffiliated third party which had a preexisting business relationship with Messrs. Baetz and Gallant, accounted for 30%, Security State Bank ("SSB"), a former affiliate of FICL, accounted for 27% and Pride Refining Bank ("Pride"), an unaffiliated third party, accounted for 16% of gross revenues. For the five month period ended May 31, 1998, BestBank accounted for 79%, Security State Bank accounted for 12% and Pride accounted for 4% of gross revenue for such five month period. On May 8, 1998, the Company entered into an agreement with Peak Card Management ("Peak"), an unaffiliated third party, to service their credit and debit cards and merchant processing. It is estimated by the Company that revenues to be derived from this agreement will aggregate $1,250,000.00 for the balance of the fiscal year ended December 31, 1998 and $2,500,000 for the fiscal years 1999 and 2000.

* * *

Agreements between the Company and its customers provide that the Company will perform data processing in order to provide to its customers computer programming and other services in connection with the Company's programs with masterCard International, Inc. ("MasterCard"), Visa U.S.A., Inc. ("Visa") and private label credit card operations. These agreements terminate at various times during the period from May, 1998 through July 31, 2005, but automatically renew for an unlimited number of successive years, unless notice of termination is given by either party no less than 180 days prior to a designated termination date.

30.     The June 16, 1998 Registration Statement also discussed the Company's arrangement with BestBank:

On October 1, 1997, the Company entered into a master agreement with BestBank (the

"Master Agreement") for processing and services for its customers with which BestBank has entered into contractual agreements. A further agreement was entered into with BestBank as of May 14, 1998, wherein the Company has agreed to provide core processing to BestBank.
. . .

BestBank is a Colorado state-chartered bank that operates primarily as a provider of credit card and debit card programs. The primary contractor to BestBank for such programs is Century Financial, an affiliate of Messrs. Baetz and gallant, which handles such programs on a turn-key basis. BestBank oversees Century's operations to monitor Century's compliance with all federal and state laws and regulations.

* * *

Because the Master Agreement provides BestBank with fixed cost pricing for services provided by the Company for credit and debit cards and merchant processing, BestBank is able to market its programs and services to other non-issuing entities. BestBank initiates new programs for card issuers while the Company obtains the processing of these accounts through the marketing efforts of BestBank. It is anticipated by management the Company that as BestBank adds new customers or new programs for existing customers, the Company will be able to expand its own business operations. . . . As of May 31, 1998, the number of credit card accounts serviced by the Company is 533,407 of which 493,259 are derived by the Company pursuant to the Master Agreement with BestBank. BestBank has approximately 130,000 additional credit card accounts which are currently committed to a competitor of the Company for processing, none of these accounts have been transferred for servicing to the Company as of the date of this registration Statement. BestBank has agreed, in principle, to begin conversion of these accounts over to the Company as soon as practicable. . . .

Further, century's agreement with BestBank calls for the servicing of a program for the introduction of debit cards, commencing on June 1, 1998. Berwyn [Holdings, Inc., Century's and the Company's affiliate] is in the process of setting up the Visa debit card program for BestBank for this new program. Through the Company's Master Agreement with BestBank, the Company will process and service this debit card program. This program will be marketed by Financial management Services, Inc. ("FMS"), an unaffiliated third party. The debit cards are to be introduced through the national chain of check cashing retail outlets, Check Cashing Store, Inc. ("CCSI") owned by FMS. FMS is currently testing this program and expects to market this program throughout the country over the next 12 months. The delivery of the debit card product is expected to be completed by October, 1998 in over 3,500 stores in the United States.

31.     The Company added:

The Company's largest customer [BestBank] has committed to a five-year contract which began on October 1, 1997. The customer and the anticipated short term future growth in the business are derived, in part, from the Master Agreement with BestBank which was arranged for by Messrs. Baetz and Gallant or their affiliates. Management believes that the contract will be honored for the full term and ultimately renewed.

CLASS ACTION COMPLAINT                    11

32.     Finity/Columbia's June 16, 1998 Registration Statement also discussed the Company's banking and financial services business:

> The Banking and Financial services component of the Company performs the processing and "backroom" operations of banks, thrifts, credit unions, insurance companies, merchants, utilities, government agencies, and others. The Company processes for 3 banks and financial institutions which represents, in the aggregate, 20% of its gross billing for 1997 and 10.3% of its gross billing for the five month period ended May 31, 1998. Although this segment does not comprise a majority of the Company's revenues for 1997, or for the five month period ended May 31, 1998, the Company believes that it can grow and expand this line of business.

33.     The June 16, 1998 Registration Statement also discussed the Company's document management and distribution service business:

> In document management, the Company offers processes for producing and reducing the amount of paper reports and statements for the customer, with its online tools for reports, microfiche processing and with the acquisition of digital document technology and Computer Output to laser Disk ("COLD") product. As of the date of this Registration Statement, the Company processes over 800,000 mail pieces per month. The Company intends to increase this business to over 3,500,000 pieces per month during the next year. . . . The increased volume is anticipated to be generated from the growth of the other operations of the Company. However, the Company expects to also add other customers with specific mailing and distribution needs.

34.     The June 16, 1998 Registration Statement reported net income of $402,171 during the three months ended March 31, 1998, as compared to net income of $8,202 during the three months ended March 31, 1997, and income from operations of $643,837 during the three months ended March 31, 1998, as compared to income from operations of $20,686 during the three months ended March 31, 1997. The Company stated that its "proposed business plan contemplates the growth of revenues in connection with the Company's expansion strategy." The Company also reported that total operating revenues for the year ended December 31, 1997 increased to $4,540,271 from $4,128,586 for the prior year, but the Company experienced a net loss of $576,167 during the year ended December 31, 1997 as compared to net income of $145,317 during year ended December 31, 1996. The Company's assets to liability ratio was 1.03 to 1 at March 31, 1998, as opposed to 0.82 to 1 at December 31, 1997.

35.     On or about July 22, 1998, the company issued its Form 10-QSB for the quarter ended

1  June 30, 1998. The Company reported net income of $666,875 for the three months ended June 30,

2  1998 compared to a net loss of $45,391 for the three months ended June 30, 1997. The Company

3  reported net income of $1,069,046 for the six months ended June 30, 1998 compared to a net loss

4  of $45,391 for the six months ended June 30, 1997.

5       36.    In July of 1998, BestBank failed, due to the massive credit card scheme orchestrated

6  in part by Defendants Baetz and Gallant, and was taken over by the FDIC. This led to rumors that

7  Defendant Finity/Columbia's revenues from BestBank were in jeopardy. To "set the record straight,"

8  Finity/Columbia issued the following announcement on August 25, 1998:

9

10      **Columbia Capital Corp. (OTC Bulletin Board: CLCK) announced today that its credit card revenues since the closing of BestBank, its largest customer, by the FDIC, have been unaffected.**   **Columbia's wholly-owned subsidiary First Independent Computers, Inc. (FICI) continues to provide processing services for the FDIC as it did for BestBank.** Numerous rumors have been    circulating about the nature and extent of the Company's operations and revenue. **The Company has put out this release to set the record straight.**

11

12

13

14  (Emphasis added).

15       37.    Approximately one year after Finity/Columbia publicly announced its agreement with

16  BestBank, the FDIC announced that it had named Defendants Baetz and Gallant as defendants in a

17  lawsuit over the BestBank credit card scheme. An October 31, 1998 press release stated, in part:

18

19      The Federal Deposit Insurance Corp. has filed a civil complaint in the shutdown of a small Colorado bank that names the bank's two top officers as well as two Fort Lauderdale entrepreneurs whose companies ran its credit card program.

20                   *       *       *

21      The two entrepreneurs, Douglas R. Baetz and Glenn M. Gallant, own or control three separate Fort Lauderdale businesses -- one publicly traded -- that marketed, processed and handled customer service for credit cards issued by BestBank.

22

23       38.    On November 5, 1998, Finity/Columbia announced that defendants Baetz and Gallant

24  resigned their positions with Finity/Columbia. The press release provided, in part:

25

26      Nov. 5, 1998– Columbia Capital Corp. (OTC-BB: CLCK) announced today that Glenn Gallant, the company's Chairman of the Board and Secretary, and Douglas Baetz, a Director,

27

resigned from the company, effective November 3, 1998. Messrs. Gallant and Baetz, who own approximately 80 percent of Columbia's outstanding stock, have agreed not to have any involvement with the company because of the pending litigation involving certain companies they control.

(Emphasis added).

39.     On January 1, 1999, the Company announced that its principal shareholders, defendants Baetz and Gallant, had contributed to the Company for no consideration all of their shares in a company called Fi-Scrip, Inc., a marketing company for ATM and debit card accounts, thus making Fi-Scrip a wholly owned subsidiary of the company.

40.     Finity/Columbia attempted to artificially buttress its stock price by issuing press releases about continuing to process the BestBank credit card accounts after they were purchased from the FDIC by RRI Credit Corporation ("RRICC").   The Company indicated that on December 24, 1998, RRICC obtained a contract to purchase the accounts of Best Bank from the Federal Deposit Insurance Corporation (FDIC), in exchange for a $1,000,000 nonrefundable deposit charged by the FDIC to bidders for the BestBank portfolio.  Finity/Columbia entered into a processing agreement with RRICC in which it loaned RRICC $1,000,000 in exchange for the right of Finity/Columbia to process the BestBank accounts if RRICC bought the portfolio.  The loan was nonrecourse unless RRICC's deposit was returned by the FDIC.

41.     Finity/Columbia's Form 8K, filed February 17, 1999 states, in part:

On November 3, 1998, the FDIC announced a sealed-bid auction for the sale of the Accounts. **On December 24, 1998, RRI Credit Corporation ("RRICC"), which is not affiliated with the Company, was awarded the contract to purchase the Accounts from the FDIC.** The purchase and sale agreement between RRICC and the FDIC, dated December 24, 1998 ("Amended Purchase and Sale Agreement") called for a one million dollar ($1,000,000) non refundable deposit to be paid by RRICC and set a closing date of January 29, 1999, at which time the transfer of the Accounts was to take place.

**On December 14, 1998, and as amended on January 15, 1999, the Company entered into an initial processing services agreement ("RRICC Processing Agreement") with RRICC for the processing of the Accounts should RRICC's bid be accepted. The term of the RRICC Processing Agreement begins on the**

**date of the closing of the purchase of the Accounts by RRICC, and terminates on the date on which the principal and interest of a certain planned financing in connection with the purchase of the Portfolio have been paid in full. At that time, the parties intend that a second agreement for the processing of the Accounts shall immediately become effective for a term of no less than ten (10) years and shall provide for fees from the processing of no fewer that three hundred thousand (300,000) credit card accounts at normal and customary rates.** In consideration for the initial processing agreement, the Company agreed to and did lend RRICC, on a non-recourse basis unless returned by the FDIC, the principal sum of one million dollars ($1,000,000) at ten percent (10%) per annum, which in turn was paid to the FDIC by RRICC as a non-refundable deposit under the Amended Purchase and Sale Agreement.

Due to certain circumstances RRICC was unable to meet certain conditions to close the purchase by January 29, 1999 and, as of January 29, 1999, RRICC and FDIC agreed to a second amendment, ("Amendment No. 2"), which extends the closing date to February 22, 1999.

(Emphasis added).

42.     In February 1999, the FDIC liquidated all but 13,000 of the BestBank accounts after talks with possible buyers fell through. Because RRICC could not meet the FDIC's conditions (including its inability to locate a sponsoring bank), it lost the bid for the BestBank portfolio. Finity/Columbia was forced to charge off the note receivable from RRICC for the $1,000,000 loan.

43.     On March 15, 1999, Finity/Columbia filed a Form 8K which disclosed that RRICC was unable to purchase the BestBank accounts and that Finity/Columbia lost a $1,000,000 non-refundable deposit in connection with RRICC's failed attempt to purchase the BestBank accounts. That Form 8K provided, in part:

> **The effect of these events will be to eliminate more than 80% of the Company's monthly revenues from processing, as measured during 1998, which will have a material adverse effect on the Company's first quarter 1999 results of operations. The inability of RRICC to close the Purchase and Sale Agreement will also result in the loss of the $1,000,000 non-refundable deposit and the nonrepayment of the Company's loan to RRICC.** Such a loss will result in the Company's charging-off of the note receivable from RRICC and will have a material adverse effect on the Company's 1998 fourth quarter and year end results of operations.

(Emphasis added).

44.     Finity/Columbia's March 15, 1999 Form 8K disclosing the inability of RRICC to purchase the Best Bank accounts included the announcement that Finity/Columbia's may have a $43.6 million claim against the FDIC for liquidated damages.  The Company submitted a $43.6 million bill to the FDIC, claiming that the processing agreement with RRICC specified that the Company was entitled to the funds if the FDIC liquidated BestBank's portfolio before October 1, 2002.  The Form 8K stated:

> The Company believes it may have a claim against the FDIC under a liquidated
> damages provision (the "Provision") in the Processing Agreement. Under the Provision, any
> termination by the FDIC before October 1, 2002 entitles the Company to liquidated damages
> equal to 80% of the average total monthly billings under the Processing Agreement for the
> most recent six months, multiplied by the number of months remaining in the term. **The
> Company has prepared an invoice dated   February 26, 1999, for liquidated damages
> in the amount of $43,566,129, which was presented to the FDIC for payment upon the
> termination and liquidation of the Accounts.** This invoice has not yet been paid.

(Emphasis added).

45.     In a May 20, 1999 article, Finity/Columbia repeated its intention to recover $43.6 million from the FDIC:

> Columbia says it hopes to offset the loss of BestBank's revenues by signing new
> clients. However, a Columbia spokesperson declined to give details.
>
> In addition, Columbia has submitted a $ 43.6 million bill to the FDIC, saying the
> processing agreement specified that it was entitled to the funds if the FDIC liquidated
> BestBank's portfolio before Oct. 1, 2002. The FDIC says it is reviewing Columbia's
> claim.

46.     On or about March 25, 1999, in press releases and/or SEC filings Finity/Columbia announced its results for the year ended December 31, 1998.  The company announced net income of $1.3 million, including an extraordinary charge of $660,000.00, compared with a net *loss* of

$424,000.00 for the prior year. The company also announced operating revenues of $12.9 million, up 308% from the prior year's operating revenues of $3.1 million. The Company announced that total operating revenue for the fourth quarter ended December 31, 1998 increased 78% to $3.4 million from $1.9 million in the prior year's fourth quarter. The Company stated: "1998 was a record year for Columbia Capital in terms of revenue and earnings." The Company also indicated that it was very active on the new business front, working with several different entities on potential new processing contracts for the Company.

47. On May 13, 1999, in press releases and/or SEC filings Finity/Columbia announced that its operating revenue for the quarter ended March 31, 1999 had increased to $3 million from $2.49 million for the prior year's quarter, and that its assets had increased from $4.3 million to $5.1 million from December 31, 1998 to March 31, 1999. In that announcement the Company noted that Fi-Scrip was "positioned to benefit greatly from the growth of debit and EBT [electronic benefits transfer system] transactions."

48. Finity/Columbia continued to hold out the prospect of recovering $43.6 million from the FDIC in its 10K filed April 15, 1999 and its 10Qs filed May 13, 1999 and August 16, 1999.

49. In its 10Q filed November 12, 1999, Finity/Columbia finally disclosed that it had no prospect of collecting $43.6 million from the FDIC relating to BestBank by omitting any reference to collecting those funds. This "corrective" omission has continued to the present day.

50. The positive statements about Finity/Columbia's business made by defendants during the Class Period were materially false and/or misleading when issued, and failed to disclose adverse information which was then known only to defendants due to their access to internal Finity/Columbia data and which was required to be disclosed to make the statements made not misleading.

51.     Defendants' statements were false and misleading for the following reasons, among others:

(a)     Defendants knew or should have known that the Company's business with and revenues from BestBank was based on a fraudulent scheme by which thousands of debit card holders whose accounts the Company processed were in fact in default of their obligations risking termination of the debit cards and accounts, that Defendants Baetz and Gallant and others had arranged for and paid minimum payments of these debit card holders to maintain the illusion that the accounts were in good order and that the Company would continue to benefit from processing those accounts, and that Baetz and Gallant had created and/or caused to be created and maintained fraudulent accounting records to account for the secret payments and hide them from the Company's accountants and the shareholders;

(b)     Defendants knew or should have known that the purported $43.6 million "bill" submitted by the Company to the FDIC, in which it claimed the Company was entitled to the funds if the FDIC liquidated BestBank's portfolio before October 1, 2002, was based on an untenable legal position, was not payable, and would not be paid, yet they continued to hold out the prospect to Plaintiffs that bill would be paid;

(c)     Defendants knew or should have known that the Company's positive statements regarding the prospects of Fi-Scrip, Inc., a marketing company for ATM and debit card accounts, and a wholly owned subsidiary of the company, were false and misleading, and that Company's statement that Fi-Scrip was "positioned to benefit greatly from the growth of debit and EBT [electronic benefits transfer system]

transactions" had no reasonable basis when made;

(d) Defendants knew or should have known that their statements to the investing public regarding strong potential revenues from purported Y-2K related sources of business were not based on any reasonable factual basis;

(e) Defendants knew or should have known that other positive statements regarding the Company's business, revenues and future revenues were false and misleading; and

(f) Defendants knew or should have known but failed to disclose that the Company's financial statements were materially false and not in accordance with generally accepted accounting principles, and in fact were in large part fraudulent.

52. Finity/Columbia's financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of Finity/Columbia's operations due to Finity/Columbia's improper accounting in violation of GAAP and SEC rules.

53. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

54. Due to accounting improprieties with respect to its income, earnings, services and/or

1  reserves, the Company presented its financial results and statements in a manner which violated

2  GAAP.

3       55.     Further, the undisclosed adverse information concealed by defendants during the Class

4

5  Period is the type of information which, because of SEC regulations, regulations of the national stock

6  exchanges and customary business practice, is expected by investors and securities analysts to be

7  disclosed and is known by corporate officials and their legal and financial advisors to be the type of

8  information which is expected to be and must be disclosed.

9
                         **FIRST CLAIM FOR RELIEF**
10                    **For Violation Of §10(b) Of The 1934 Act**
                      **And Rule 10b-5 Against All Defendants**
11

12       56.     The preceding and superceding paragraphs are incorporated herein by this reference.

13       57.     During the Class Period, defendants disseminated or approved the false statements

14  specified above, which they knew or recklessly disregarded were misleading in that they contained

15  misrepresentations and failed to disclose material facts necessary in order to make the statements

16  made, in light of the circumstances under which they were made, not misleading.

17

18       58.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

19       (a)     Employed devices, schemes, and artifices to defraud;

20       (b)     Made untrue statements of material facts or omitted to state material facts

21  necessary in order to make statements made, in light of the circumstances under which

22  they were made, not misleading; or

23

24       (c)     Engaged in acts, practices, and a course of business that operated as a fraud or

25  deceit upon Plaintiffs and others similarly situated in connection with their purchases

26  of Finity/Columbia's common stock and publicly traded options during the Class

27

Period.

59.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Finity/Columbia stock and options. Plaintiffs and the Class would not have purchased Finity/Columbia stock or options at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

60.     As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Finity/Columbia common stock and its publicly traded options during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violation Of §20(a) Of The 1934 Act
### Against All Individual Defendants

61.     The preceding and superceding paragraphs are incorporated herein by this reference.

62.     Each of the Individual Defendants acted as a controlling person of Finity/Columbia within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and directors of Finity/Columbia, and their ownership of Finity/Columbia stock, the Individual Defendants had the power and authority to cause Finity/Columbia to engage in the wrongful conduct complained of herein.

## SECOND CLAIM FOR RELIEF
### Civil Rico
### Against All Individual Defendants

63.     The preceding and superceding paragraphs are incorporated herein by this reference.

64.     During the relevant time frame, Defendants have engaged in at least two acts of

65.   racketeering, including, but not limited to,  committing wire fraud, mail fraud, and securities fraud.  In undertaking the aforedescribed actions, Defendants, and each of them, have engaged in a pattern of racketeering activity, pursuant to 18 U.S.C section 1962 (a),(b),(c) and (d). Among other things, Defendants' acts constitute violations of 18 U.S.C sections 1951 (interference with commerce and extortion); 1952 (racketeering); 1957 (relating to engaging in monetary transactions in property derived from unlawful activity); and 1959 (use of violence in racketeering activities).

66.   In undertaking their unlawful actions, defendants, and each of them, have through a pattern of racketeering activity, become associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and have conducted or participated in the conduct of the affairs of said enterprise.

67.   In undertaking their unlawful actions, Defendants, and each of them, have violated and conspired to violate the provisions of 18 U.S.C. 1962 (a), (b), (c) and (d).

68.   BestBank made money off every card it issued. Defendants Baetz and Gallant reaped a quarter of a billion dollars from the $ 498 travel-club memberships sold by their All Around Travel Club.  Defendant Finity/Columbia (run by defendants Baetz and Gallant) reaped millions more processing the applications and servicing the BestBank accounts that were essentially worthless.  By reason of the foregoing, Plaintiffs have been injured in their business or property in an amount which cannot be presently ascertained.  Among other damages and injuries, Plaintiffs have sustained economic damages by virtue of their investments in Finity/Columbia.

69.   As a result of the foregoing, Plaintiffs are entitled to treble damages, plus interest, in an amount to be determined; costs of this suit, and attorneys fees.

CLASS ACTION COMPLAINT                                22

# FOURTH CAUSE OF ACTION
## California Corporations Code section 25400, et seq.
## Against all Defendants

70.   The preceding and superceding paragraphs are incorporated herein by this reference.

71.   California Corporations Code section 25401 makes it unlawful for any person to offer or sell a security in California or buy or offer to buy a security in California by means of any written or oral communication which contains an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

72.   Defendants, by the acts herein complained of, sold or caused to be sold Finity/Columbia securities in California by means of written and/or oral communications containing untrue statements of material fact and/or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendants thus are in violation of California Corporations Code section 25401.

73.   California Corporations Code section 25402 makes it unlawful for any issuer or person who is an officer, director or controlling person of any issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

74. Defendants, who were officers, directors or controlling persons of Finity/Columbia, had access, directly or indirectly, to material information about the issuer not generally available to the public. Defendant, by the acts herein complained of, purchased and/or sold securities of Finity/Columbia in California at a time when they knew material information about the issuer gained from such relationship that would significantly affect the market price of Finity/Columbia common stock and which was not generally available to the public, and which they knew was not intended to be so available. Defendants had no reason to believe that the person selling to and/or buying from them also had possession of the information. Defendants thus are in violation of California Corporations Code section 25402.

75. Under section 25501, defendants are liable to plaintiffs for rescission and/or damages for their violations of section 25401. Under section 25502, defendants are liable to plaintiffs for damages for their violations of section 25402.

### FIFTH CAUSE OF ACTION
### Common Law Fraud
### Against All Defendants

76. The preceding and superceding paragraphs are incorporated herein by this reference.

77. Defendants knew that the representations they made to plaintiffs regarding Finity/Columbia, its finances and prospects were false and misleading when made. Defendants also knew that the omissions of material fact made to plaintiffs regarding Finity/Columbia, its finances and prospects, were false and misleading when made.

78. Defendants made these false representations, and omitted to state material facts, with the express purpose of inducing plaintiffs to invest and purchase shares in Finity/Columbia.

79. In addition and/or in the alternative, Defendants exercised gross negligence or

recklessness in making the representations they made to plaintiffs regarding Finity/Columbia, its finances and prospects. Defendants also exercised gross negligence or recklessness in omitting material facts regarding Finity/Columbia, its finances and prospects.

80.    Plaintiffs reasonably relied on Defendants' false representations, and on their omissions to state material facts, to invest in and purchase shares of Finity/Columbia common stock and/or to forbear from selling their shares of Finity/Columbia common stock.

81.    As a result of the false representations and omissions of Defendants, plaintiffs were injured.

## SIXTH CAUSE OF ACTION
### Negligence
### Against all Defendants

82.    The preceding and superceding paragraphs are incorporated herein by this reference.

83.    Defendants had a duty to exercise reasonable care to plaintiffs and class members, who were shareholders in Finity/Columbia, including a duty to exercise reasonable care to ensure the accuracy of Finity/Columbia's financial statements, SEC filings, and public statements regarding its business and finances.

84.    Defendants failed to exercise reasonable care in the above respects, and thus were negligent, and such negligence was a cause of injury to plaintiffs and the class members. Such injury is the kind that does not occur in the absence of negligence or fraud. A person of ordinary prudence in the same situation and possessing the same knowledge as defendants would have foreseen or anticipated that plaintiffs and class members would be injured by or as a result of the actions or inactions and that such actions or inactions could reasonably have been avoided. A reasonably prudent person under circumstances similar to defendants, including the fact that defendants

disseminated the representations set forth above intending that they be read and relied upon, would exercise extreme caution in making such written representations as such circumstances were in the exclusive control of defendants.

85.     By reason thereof, plaintiffs and other members of the class have suffered damage, in an amount according to proof at time of trial.

## SEVENTH CAUSE OF ACTION
### Negligent Misrepresentation
### Against all Defendants

86.     The preceding and superceding paragraphs are incorporated herein by this reference.

87.     Defendants made positive assertions, in a manner not warranted by the information available to defendants, of that which is not true, in violation of their duty to disclose the material facts set forth above. These representations were material.  These representations were uniformly made in writing to plaintiffs and the members of the class.

88.     Plaintiffs and the members of the class, unaware of the falsity of defendants' representations of said material facts and reasonably relying upon representations as particularly alleged herein, purchased shares of Finity/Columbia common stock and/or forbore from selling shares of Finity/Columbia common stock.

89.     As a proximate result of defendants' misrepresentations and omissions of material facts, plaintiffs and the class members have suffered damage.

\\

\\

\\

CLASS ACTION COMPLAINT                                    26

### EIGHTH CAUSE OF ACTION
**Unfair Business Practices, California Business
and Professions Code section 17200, et seq.
Against all Defendants**

90.     The preceding and superceding paragraphs are incorporated herein by this reference.

91.     Defendants have engaged in improper or illegal activities which amount to unfair business practices, under Business and Professions Code section 17200, et seq.

92.     Defendants have solicited and collected money from members of the public (including residents of California) for investments in Finity/Columbia securities. Plaintiffs are informed and believe that the money collected by Defendants has been used to further Defendants' unlawful activities. When investing money in Finity/Columbia securities, plaintiffs did not know it was furthering defendants' unlawful activities. Moreover, material information that would impact on the investing public's decisions on whether or not to invest money in Finity/Columbia was withheld from investors.

93.     The actions of Defendants alleged in this complaint constitute violations of the Unfair Practices Act, California Business and Professions Code section 17200, et seq. Additionally, the benefits of Defendants' actions, when weighed against the risk of misleading or harming the public, are far out weighed so as to constitute unfair business practices.

94.     Pursuant to California Business and Professions Code section 17204, Plaintiffs bring this cause of action on their own behalf and on behalf of the public.

95.     In doing the acts alleged, Defendants acted with the intent and purpose of preying on the public, who are unaware of Defendants' pattern and practice of illegal activities.

96.     Plaintiffs and the public have no adequate remedy at law, since many of the unfair acts

CLASS ACTION COMPLAINT                      27

1  alleged herein are perpetrated in secret, without the knowledge of the public. Defendants' acts also

2  serve to divert business of other bona fide organizations and destroy competition.

3        97.     Plaintiffs are informed and believe that the acts of Defendants alleged herein have

4
5  caused the public damages in excess of the jurisdictional limits of this court, and that any further acts

6  by Defendants, unless restrained, will cause irreparable injury and damages to the public and

7  Defendants' competitors, the exact nature, amount, and extent of which will be impossible to

8  ascertain.

9        98.     Plaintiffs also seeks an order requiring Defendants to disgorge profits acquired by

10
11  means of the unfair business practices alleged above.

12        99.     Plaintiffs are also entitled to a reasonable award of attorneys fees for acting in the

13  public's interest.

14                    **NINTH CAUSE OF ACTION**
                          **Conspiracy**
15                     **Against all Defendants**

16
17        100.    The preceding and superceding paragraphs are incorporated herein by this reference.

18        101.    Plaintiffs are informed and believe and thereon alleges that, in addition to or in the

19  alternative to acting individually for their own improper purposes, Defendants, and each of them, also

20  intentionally conspired with each other to perpetrate the wrongful and illegal acts alleged herein.

21        102.    As direct and proximate result of Defendants' current and

22
23  past actions, Plaintiffs have suffered damages in an amount to be proved at time of trial.

24        103.    Defendants' actions were intentional and done with malice. Plaintiffs are, therefore,

25  entitled to an award of punitive damages pursuant to Civil Code Section 3294 and other applicable

26  law.

27

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased shares of Columbia common stock and its publicly traded options during the period October 31, 1997 through November 12, 1999, inclusive (the Class Period), and who were damaged thereby. Excluded from the Class are defendants; the officers and directors of the Company during the Class Period, members of their immediate families, and their legal representatives, heirs, successors or assigns; and any entity in which defendants have or during the Class Period had a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members of the Class and that they are geographically dispersed. As of this filing, there were millions of shares of Finity/Columbia common stock outstanding, which during the relevant time actively traded under the ticker symbol "CLCK" through the NASDAQ bulletin board.

106.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law and state law that is complained of in this Complaint.

107.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

CLASS ACTION COMPLAINT                        29

(a)     Whether defendants' acts as alleged herein constitute violations of the federal securities and state law;

(b)     Whether defendants participated in and pursued the common course of conduct complained of herein;

(c)     Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, finances and operating performance of Finity/Columbia;

(d)     Whether the market price of Finity/Columbia's common stock and options during the Class Period was artificially inflated due to the material misrepresentations and failure to correct the material misrepresentations complained of in this Complaint; and

(e)     Whether the members of the Class have sustained damages as a result of defendants' conduct and, if so, the proper measure of damages.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## STATUTORY SAFE HARBOR

110.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false forward-looking statements pleaded in this Complaint. The statutory safe harbor does not apply to Finity/Columbia's false financial statements.

Also, none of the particular oral forward-looking statements pleaded herein were identified as "forward-looking statements" when made.  None of the written forward-looking statements made were identified as forward-looking statements.  Nor was it stated as to either type of forward-looking statement that actual results "could differ materially from those projected."  Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements accompany those forward-looking statements.  Each of the forward-looking statements alleged herein to be false was authorized by an executive officer of Finity/Columbia and was actually known by each of the Individual Defendants to be false when made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(1)     Declaring this action to be a proper class action pursuant to Rule 23;

(2)     Awarding Plaintiffs and the members of the Class damages, interest and costs (including reasonable attorneys' fees);

(3)     Awarding equitable and/or injunctive relief as permitted by law or equity, including the imposition of a constructive trust upon the proceeds of defendants' insider trading, pursuant to Rules 64, 65, and any appropriate state law remedies, and an order requiring Defendants to disgorge all profits and/or contributions obtained as a result of unfair practices; and

\\\

\\\

\\\

\\\

1        (4)    Awarding such other relief as the Court may deem just and proper.

2

3
Dated: October 30, 2001                    THOMAS D. MAURIELLO
4                                          LAW OFFICES OF THOMAS D. MAURIELLO
                                           4040 Civic center Drive, Suite 200
5                                          San Rafael, CA  94903
                                           Telephone: 415/472-4953
6                                          Facsimile: 415/472-7713

7
                                           DARREN J. QUINN
8

9

10                                         LAW OFFICES OF DARREN J. QUINN
                                           101 West Broadway, Ste. 1950
11                                         San Diego, California 92101-3548
                                           Telephone: 619/232-9400
12                                         Facsimile: 619/232-9488

13
                                           Attorneys for Plaintiffs
14

15

16

17

18

19

20

21

22

23

24

25

26

27

CLASS ACTION COMPLAINT                          32

1

## JURY DEMAND

2

3    Plaintiffs demand a trial by jury.

4    DATED this 30th day of October 2001.

5

6                                    THOMAS D. MAURIELLO
                                     LAW OFFICES OF THOMAS D. MAURIELLO
7                                    4040 Civic Center Drive
                                     Suite 200
8                                    San Rafael, CA  94903
                                     Telephone: 415/472-4953
9                                    Facsimile: 415/472-7713

10                                   DARREN J. QUINN

11

12                                   LAW OFFICES OF DARREN J. QUINN
13                                   101 West Broadway, Ste. 1950
                                     San Diego, California 92101-3548
14                                   Telephone: 619/232-9400
                                     Facsimile: 619/232-9488
15

16

17

18

19

20

21

22

23

24

25

26

27

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Richard Plestina<br><br>Deschutes County, OR | Douglas R. Baetz, Glenn M. Gallant, Finity Holdings, Inc. (fka Finity Holdings, Inc.), Finity Computer Corporation (fka First Independent Computers Corp.), Chuck LaMontagne, Kenneth Klotz |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED<br>PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br><br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Thomas D. Mauriello<br>4040 Civic Center Dr.<br>Suite 200<br>San Rafael, CA 94903 | Darren J. Quinn<br>101 W. Broadway<br>Suite 1950<br>San Diego, CA 92101 | Ernest A. Martz<br>21515 Hawthorne Blvd<br>Torrance, CA 90503 | Mark Dosker<br>Squire Sanders & Dempsey<br>One Maritime Plaza, Third Floor<br>San Francisco, CA 94111 |

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

Securities Exchange Act, §10(b), §20(a) and SEC Rule 10b-5

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | |
| | | | ☐ 690 Other | ☐ 861 HIA (1395ff) | |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendants) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 240 Tort to Land | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removal from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint<br>JURY DEMAND: ☒ YES ☐ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY (See Instructions): | JUDGE Jones | | Docket Number |
|---|---|---|---|

DATE: 11/5/01                    SIGNATURE OF ATTORNEY OF RECORD                    Darren J. Quinn

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

01 CV 2024 VEG (POR)

76530 / Pd $150